## Munroe *et al. vs.* Phillips, administratrix.

WARNER, Chief Justice, being engaged in presiding over the senate organized as a court of impeachment, did not sit in this case.]

1. In 1868, no ordinary had power to dismiss from his trust a guardian of free persons of color, appointed as such prior to the abolition of slavery, and appoint a successor in such guardianship. An order of dismission based on the appointment of a successor, and on an accounting with him instead of with the wards, is void if no citation or other notice to the wards, nor any election by them, is made to appear by recitals in the order, or otherwise. After the *status* of free persons of color became changed both civilly and politically, a guardian of that class of persons was placed in new relations, and his holding of the property of his wards was thenceforth more in the nature of a general trust. Nevertheless, the ordinary had and has jurisdiction of returns relating to his management. Such returns are not conclusive upon him in all respects, but are open to explanation.

2. During the existence of slavery, there was no law or public policy against the ownership of personal property by free persons of color, and no law for any slave to have a guardian. The appointment of a white man as guardian for certain negroes, and his acting in such capacity, involved their freedom as a foregone conclusion. If they were *de facto* free in "slavery times," and he made returns to the ordinary in 1868, reaching back to 1854, in which he debited and credited them as his wards, it need not further appear whether they were free *de jure* or not, in order to hold him to account lawfully for a fund which he received for their benefit in 1854, and to the management of which, as their guardian, his said returns relate. He stands committed to their having acquired freedom by some lawful means, and to their ownership of the fund.

3. The burden of proving that the fund was converted into Confederate bonds in a legal way, is upon the guardian, or his representative.

4. When the plaintiffs have introduced in evidence one of several returns to the ordinary, made at the same time and sworn to in one and the same affidavit, the defendant may introduce the rest of the series, and the whole may be considered by the jury as one entire document. They are, however, not bound to give equal credit to all the several parts.

5. As to the effect of infancy in reply to the limitation act of 1869, see *Jordan vs. Ticknor*, 62 *Ga.*, 123; *Windsor vs. Bell*, 61 *Ib.*, 671.

Guardian and ward. Free persons of color. Slave. Statute of limitations. Evidence. Before Judge CRAW-FORD. Muscogee Superior Court. November Adjourned Term, 1878.

Reported in the opinion.

BLANDFORD & GARRARD; THORNTON & GRIMES, for plaintiffs in error.

PEABODY & BRANNON; JAMES RUSSELL, for defendant.

BLECKLEY, Justice.

On the 23d of April, 1878, three sisters—Victoria Munroe, Maria Gray and Missouri Overton—brought assumpsit against Laura Phillips as administratrix of Pleasant J. Phillips, deceased, in Muscogee superior court. The declaration alleged that the defendant's intestate, as guardian of the plaintiffs, received from Henry Lowe, their reputed father, the sum of $4,268.76, on the first of January, 1854, to and for the use of the plaintiffs; that he undertook and promised to pay the plaintiffs said sum when requested; that neither he, while in life, nor his administratrix, since his death, has paid the same, *etc.* The defendant pleaded, first, non-assumpsit; second, that at the March term, 1868, of the court of ordinary of Muscogee county, which court had jurisdiction of the trust, the intestate was by the judgment of that court discharged from his trust as guardian

of the plaintiffs, and then delivered all property and paid all money held by him as such guardian, upon a fair settlement of his accounts, to Philip Munroe, his successor in the guardianship, filing in the office of the ordinary the receipt of the said successor in full; and that more than five years had elapsed after each of the plaintiffs became of age before their action was commenced; third, that more than ten years had elapsed before the suit, after the right of action, if any, had accrued ; and, fourth, that more than four years had elapsed before the suit, after the right of action, if any, had accrued.

The case was tried, and the jury found for the defendant. The plaintiffs, not moving for a new trial, sued out a writ of error on the rulings and charge of the court, and its refusal to charge. The evidence at the trial disclosed the following state of facts :   The plaintiffs were the negro slaves of Henry Lowe, and they, together with their brother, Polk, were his reputed children by Sophy Lowe, a woman of color (his own slave).; that in the year 1854, the defendant's intestate received from Henry Lowe $14,000.00 for Sophy and her four children, of which sum $1000.00 each was for her and the three girls, and $10,000.00 for Polk, the son ; that this fund was not turned over by Lowe to the intestate by deed, will or other writing, but it was in divers notes on good and solvent persons, and the notes were delivered in the presence of a witness ;. that Lowe had previously made a will providing for Sophy and her children, but being advised that it was not lawful to bequeath property to slaves, he gave the fund into the hand of the intestate in the manner above stated ; that all this occurred in Georgia, where all the parties resided ; that Lowe died in July, 1854, and not long thereafter, perhaps in 1855 or 1856, the intestate sent Sophy and the plaintiffs to Washington, D. C., and Polk to Pittsburg, Pa., or they went at his instance, he paying their expenses ; that the purpose was for Sophy to reside in Washington and educate her children, but she soon concluded to return to Georgia, and did return in two or three weeks,

bringing the plaintiffs back with her; that after their return they staid in Harris county about three weeks, and the intestate then removed them to Columbus, in Muscogee county. The plaintiffs introduced in evidence a certificate of the clerk of the inferior court of Muscogee county, under the seal of said court, dated May 6, 1856, describing Sophy as a free person of color residing in that county, reciting that advertisement had been made, and certifying that she was duly registered as a free person of color, and certifying also that the intestate was then her guardian. They likewise introduced the records of the court of ordinary of Muscogee county, containing all the returns of the intestate as guardian of the plaintiffs and their mother. The returns were all made and sworn to at the same time, one and the same affidavit verifying the whole series, and it was dated March 2, 1868. The plaintiffs read as their evidence only the returns for the first two years, the years 1855 and 1856, the former showing a balance against the guardian of $4,148.19, and the latter of $3,913.45. The defendant read the other returns, and, over the objections of plaintiffs, read from the same records an order, or orders, passed by the ordinary at the March term, 1868, discharging the intestate from the guardianship of the plaintiffs, and appointing Philip Munroe in his place. It appeared that there was a full settlement and a receipt in full between the outgoing and incoming guardian; that the former turned over to the latter, as the assets, certain Confederate bonds and treasury notes, and gave him $50.00 in money for each of the plaintiffs. The new guardian was the husband of Victoria, one of the plaintiffs. Not long after this transaction, Munroe and wife and the other two plaintiffs all emigrated to Liberia, the intestate advising the two girls to go with their sister and her husband. The two never returned, but married in Liberia, and are there still. Munroe and wife came back to Georgia about 1871 or 1872, and Munroe died a year or two thereafter. As to the ages of the plaintiffs, it appeared that Victoria arrived at majority in 1863, and

married Munroe some time during the late war; the elder of the other two plaintiffs attained her majority in 1871, and the younger in 1872. Sophy, the mother, died in 1864. The intestate, Phillips, died October 12, 1876, and letters of administration were issued to the defendant at March term, 1877. There was evidence introduced by defendant showing that Confederate money was collected during the war on paper payable to the intestate as guardian, and that he funded in Confederate bonds. No order to fund, such as the statutes passed during the war required, was produced. The judgment of the ordinary discharging the intestate from the guardianship, and appointing Munroe to succeed him, did not recite any citation or other notice to the next of kin or to the wards, nor any election by them; nor did any such citation, notice or election appear by other testimony.

The several propositions excepted to in the charge of the court were in substance as follows: 1. That a guardian is not estopped by his returns. 2. That if the plaintiffs were slaves in 1854, and if the fund claimed was at that time turned over to Phillips for their use and benefit, as part of a scheme for their emancipation, and for their support afterwards in Georgia, the gift was void, and plaintiffs cannot recover. 3. If the settlement was without fraud it was final, save that it was subject to be opened by the minor wards within five years after they arrived at majority. 4. That the limitation of ten years does not apply. 5. That if the guardian received Confederate money when he received it for himself, and when other prudent creditors received it, and if he afterwards invested it in Confederate bonds, in good faith and as the best that could be done at the time, then he would not be liable; and more especially, if without fraud he turned them over to Munroe, who received them in satisfaction. One of the exceptions is to the refusal of the court to charge, at the plaintiffs' request, as follows: "If Lowe placed money in Phillips' hands when the plaintiffs were slaves, for their benefit, and if the

plaintiffs afterwards became free, and Phillips, after their freedom, made returns to the court of ordinary whereby he admitted that he had money in his hands as their guardian, then he is bound by his returns to the ordinary."

1. There is no dispute that the plaintiffs are persons of color, and that Phillips was once their guardian. His character of guardian is alleged in the declaration, and is admitted in the second plea. But that plea makes the point that he was legally discharged by the ordinary, and a successor appointed, in March, 1868. The record shows that the order of discharge was based on the order granted at the same term appointing the successor, and upon an accounting with the successor and not with the wards. It fails to show, nor is there any evidence whatever, that there was any citation or other notice to the next of kin or to the plaintiffs, or any election by them, or any of them, to change the guardianship. The general law providing for the dismission of guardians requires a previous publication of the application. Code, §1849. The provision for the resignation of a guardian is found in the next preceding section, and reads as follows: " Any guardian who, from age, infirmity, removal from the county, or for any other cause, desires to resign his trust as such, may apply to the ordinary having jurisdiction of the trust, setting forth the reasons therefor, and also the name of some suitable person willing to accept the trust, whereupon the ordinary shall cite such person and also the nearest of kin of such ward, to appear at the next term of said court, and if the ordinary shall be satisfied that such change of guardians will not be detrimental to the interest of the ward, and no good cause is shown against it, he shall grant the prayer of the applicant, discharging him from his trust on the following conditions, viz : that he shall forthwith deliver all property and pay all money held by him as such guardian, upon a fair settlement of his accounts, to his successor ; and upon the filing of the evidence of such settlement, and the receipt in full of his successor, the guardian shall be discharged from his

said trust.  The ward shall have the privilege, within five years after he comes of age, to re-open such settlement and call for an account."  If this provision were applicable, we think the evidence fails to show that it was pursued.  It contemplates that the nearest of kin of the ward shall be cited, and have an opportunity to show cause.  But we do not think it can be held applicable, for the reason that all guardianships of free persons of color were terminated, as guardianships strictly, when the *status* of free persons of color became changed both civilly and politically by the results of the war and what ensued.  If Phillips was the guardian of negroes prior to the war, they were free persons of color, for there was no law for any slave to have a guardian ; and the distinctive legal class "free persons of color" had ceased to exist in this state in 1868.  This great change of *status* placed those who had been guardians of that class in new relations, and their subsequent holding of the property of their former wards was in the nature of a general trust, superinduced by operation of law.  The guardianship proper having terminated, such guardians could no more resign to or before the ordinary than could a guardian appointed for an infant, during infancy, resign after his ward had become of age.  Adult negroes could at once call their former guardians to account ; and infant negroes could do so too, suing, if not by a next friend, by a guardian appointed for them as infants.  Doubtless it . would have been perfectly competent for the ordinary, on due citation, or on the election of the two plaintiffs who were then minors, to have appointed a guardian for them, not as free persons of color, but as infants.  The mistake was in applying the law of resignation and succession, where the law of a new and original guardianship of altogether another class from that which had existed and expired, was applicable.  Nor was this quite all of the mistake, for as to the plaintiff who was no longer a minor in 1868, there was no cause for a further guardianship of any sort.  The true view of the situation of Phillips in 1868 is,

not that he was the holder of a living guardianship with power to resign it, but that he had already been turned out of office as guardian and converted into a trustee of a more general class; nevertheless, as all trustees having in their hands a pecuniary fund, as a part of the trust estate, or receiving any sums of money as income or proceeds of such estate are, by section 2324 of the Code, to make returns to the ordinary . . . under the same rules and regulations as are prescribed for guardians, the ordinary was not without jurisdiction of the returns which Philips made. We rule, too, that his returns are not conclusive against him in all respects, but are open to explanation. See 45 *Ga.*, 520; 59 *Ib.*, 213, and compare 11 *Ib.*, 262; 25 *Ib.*, 696.

2. But we do not agree with the circuit judge that they can be explained to the extent of breaking up the whole trust, and putting a negative upon the very existence of the trust relation and of the admitted guardianship out of which that relation sprang. We are dealing with personalty and not with realty, and this is material to be borne in mind when comparing the present case with some cases that have preceeded it. While slavery existed, there was no law or public policy against the ownership of personal property (other than slaves) by free persons of color, but a different rule prevailed as to realty. Personalty could be owned by free persons of color, without limit, in all parts of the state. But by a slave nothing could be owned, for all his acquisitions belonged, as he did, to his master. The appointment of Phillips as guardian for the plaintiffs and their mother, and his acting in the capacity of their guardian, presupposed their freedom—involved it as a foregone conclusion. He could not have been the guardian of slaves; there was no law for it. If these negroes were *de facto* free (and the evidence indicates they were, long before slavery was abolished) and if Philips acted as their guardian from and after 1854, debiting and crediting them as his wards, (and his sworn returns show that he so did) what matters it whether they were free *de jure* or not?

We have the oath of Phillips that he was their guardian, that he had their funds as such, and expended a part thereof for their benefit. The other evidence shows that the funds came by gift from their reputed father, and not from Phillips. The latter was not dealing with the wards as free, at his own expense, and never in his life-time made the point that they were not free. As late as 1868, he recognized and avowed their freedom, as dating at least as far back as 1855, and their title to the original fund in his hands, and this he did by a solemn admission in *judicio*. Can his representative, at this late day, raise the question of their freedom *de jure*, and overturn the whole fabric of guardianship, trust and title? Has so wide a range ever been taken under the name of explaining returns? All slavery long ago abolished, one of the wards (the mother) dead, the guardian dead, and now the questions are made for the first time, were the wards free? Could they legally have a guardian in 1855, and for the ten years succeeding? Could they own the personal property which the guardian never claimed for himself, but always treated as theirs? We think the guardian stood committed to the theory that his wards had acquired their freedom by some lawful means, and to their ownership of the fund, (the fund being personalty) and that his administratrix must abide the consequences.

3. The returns are open to explanation as to the amount of the fund, the changes through which it underwent, etc., but no conversion of it from one form into another, as into Confederate bonds, could be recognized as binding upon the wards, unless it was made in a legal way. To invest trust assets in Confederate bonds, the statutes on that subject in force at the time, with reference to the procuring an order from the judge of the superior court, had to be pursued. The burden of proof on this branch of the case is upon the defendant.

4. Though the plaintiffs read but two of the returns, it was competent for the defendant to introduce the rest, and for the jury to consider the whole as one entire document,

giving more or less credit to the several parts as they thought they deserved. The returns were all made at the same time, and sworn to in one and the same affidavit.

5. The declaration is not properly framed, and if it had been demurred to, it ought to have been amended. Indeed, it ought still to be amended, so as to set out the actual facts more fully. But the question of limitation was not raised upon the declaration separately; and on the evidence, the ten years term, and not that of five or of four years, applies Code, §2922. The cause of action could not be considered as accruing before free persons of color ceased to exist in our system as a separate class. The two plaintiffs who were infants when the war closed would have the full ten years from the time they attained majority. Code, §2926 It will be noticed that the application of the act of 1869 was not suggested in the record. If it had been, with the declaration left in its present shape, the following cases would have been somewhat in point : *Windsor vs. Bell*, 61 *Ga.*, 671; *Jordan vs. Ticknor*, 62 *Ib.*, 113. And see *Beavers vs. Camp*, last term. The declaration is very unsatisfactory, when compared with the evidence, but it is amendable, and no direct point seems to have been made upon it below.

Cited by counsel for plaintiffs. On change of guardians, Cobb's Dig., 985, 977; Code, §1811. On estoppel by returns, 11 *Ga.*, 262; 25 *Ib.*, 696; 1 G'rl'f on Ev., §§207, 208; 1 Bos. & Pull., 293; Code, §3753. On period of limitations, Code, §§2922, 2926, 2931.

Cited by counsel for defendant. On gift to slaves, 6 *Ga.*, 539; 20 *Ib.*, 338; 26 *Ib.*, 225, 625; 30 *Ib.*, 253, 275; 38 *Ib.*, 655; 46 *Ib.*, 361, 399; 58 *Ib.*, 118; 61 *Ib.*, 248. On change of guardians, Code, §1848; Cobb's Dig., 985, 999; and sufficiency of recitals in the order, 47 *Ga.*, 195; 52 *Ib.*, 604; 56 *Ib.*, 307, 308. On limitations, 54 *Ga.*, 500; 55 *Ib.*, 35; 56 *Ib.*, 416; 58 *Ib.*, 382.

Judgment reversed.