SMITH *et al.* *vs.* DuBose *et al.*, executors.*

1. Past cohabitation alone would not render a gift by the party holding such a relation to a woman, void or illegal.
(*a*) A contract to make compensation for the injury done in consequence of illegal cohabitation, which contained no stipulation for future intercourse, has been held to be valid; and even where

---

*This case was argued at the last term, and the decision reserved.

such a contract had been fully executed and the intercourse was kept up afterwards, yet if it did not appear that the subsequent cohabitation was made a stipulation in the contract, it has been maintained. Where there was no evidence of any promise or understanding other than that inferred from the fact of the future illicit intercourse between the parties, this did not affect the validity of the transaction.

(b) Neither at the testator's death nor when the will was executed could a continuance of the relations between Eubanks (the putative father of the children, who, with their mother, were leading beneficiaries) and Amanda (the mother of such children and the putative child of the testator) have been contemplated, Eubanks then being dead; nor is there anything in the case to show that the testator had knowledge of any illicit intercourse between one of the persons whom he appointed as his executor and Amanda, occurring subsequently to the death of Eubanks. No offspring resulted therefrom, nor is there anything in proof to charge the testator with knowledge of it or to show that he in any way encouraged it; nor did his will make provision for carrying on of such intercourse or for the maintenance and support of any offspring therefrom.

(c) Illicit intercourse between persons of the same race, as well as persons of different races, is made penal by the law of this State, as also is intercourse between persons standing in near relation of consanguinity or affinity to each other, whether taking place in consequence of prohibited marriage or otherwise. A white man may be guilty of fornication with a colored woman, and *vice versa;* and a white or colored man, if a child is begotten in consequence of such illicit intercourse, may be held liable for bastardy. There is no difference in this respect between the rights and liabilities of the different races.

(d) Under the 14th amendment of the constitution of the United States, it has been held by the Supreme Court of the United States that all colored persons born in the United States and subject to its jurisdiction, are citizens of the United States, and of the States in which they reside, and our State constitution declares that all citizens of the United States, residing in this State, are citizens thereof. All distinctions as to the rights pertaining to citizenship between the two races are abolished, and as to their civil rights, they stand upon the same footing. Therefore, whatever rights and privileges belong to a white concubine, or to a bastard white woman and her children, under the laws of Georgia, belong also to a colored woman and her children, under like circumstances, and the rights of each race are controlled and governed by the same enactments or principles of law.

(e) Among the rights of citizens enumerated by the code of this

State are the right to the acquisition and enjoyment of private property and the disposition thereof, the right to vote, hold office, etc. A testator, by his will, may make any disposition of his property not inconsistent with the laws or contrary to the policy of the State. Most persons are deemed capable of taking under will, and the exceptions as to those who are incapable of so taking are carefully enumerated and rest generally upon grounds of public policy; among these are alien enemies and others whose participation in such benefits could, in any sense of the word, be called immoral; as, if a will makes a devise or bequest to further or carry into effect some illegal purpose which the law regards as subversive of sound public policy and good morals, or if a condition be imposed tending to a separation or divorce between husband and wife, or other like restraints upon testamentary disposition which local law sees fit to enforce; and these may differ in different jurisdictions and different times.

(*f*) There is nothing in the law of this State prohibiting a putative father from making provision for his illegitimate child, or for the illegitimate offspring of such child. And even conviction of treason or felony, or any lower grade of crime, works no corruption of blood or forfeiture of estate.

(*g*) Courts hold themselves bound to the observance of rules of extreme caution, when invoked to declare a transaction void, on grounds of public policy; and prejudice to the public interest must clearly appear before a court will be warranted in pronouncing the transaction void on this account. It is not to be lightly inferred from facts and circumstances of doubtful import and meaning, or which may admit of different construction, one consistent with and the other opposed to unquestioned policy. Courts are not invested with legislative powers in such matters.

(*h*) There is no constitutional or statutory provision, and no decision of the courts of this State, which holds it to be immoral or wrong for the putative father to make provision for his illegitimate child, whether that child be white or colored, or for the legitimate offspring of such child, whatever the complexion of such offspring may be, or for any one who has lived in violation of the public law, and thereby become a criminal either to a greater or less extent, unless that provision is the result of a previous understanding that led to the commission of the offence and induced a breach of the law and sound public policy of the State.

2. Whether the will in this case was procured by the fraud of Amanda and her mother, in inducing the testator to believe that Amanda was his daughter, and that her offspring were the children of Eubanks, and whether they were not so in fact, and whether such representations had the effect of procuring the will, were submitted to the jury; and taking the part of the charge

excepted to in connection with other portions of the charge on the same subject, the questions were properly submitted and the charge was not too restricted.

3. Apart from the representations as to the paternity of Amanda and that of her children, no effort was made to exert any influence over the testator, nor is it made clear that he was subject to such influence, or that his will was so weak and his purpose so infirm as to justify a belief that either could have been overcome in that manner.

4. The remaining grounds of the motion for a new trial have not such merit as would authorize this court to interpose and set aside the will. No error appears, either in selecting the jury from the panel of grand jurors, or in drawing and summoning that panel, or in the reception or rejection of testimony, or in the assignments of errors in the various charges as given or refused, or in the rules laid down for judging of the credibility of witnesses, or in refusing to hold two of the jurors who tried the case to be biased or prejudiced.

5. This case was argued before a full bench of three justices. After the argument, Chief Justice Jackson died. After his death, counsel for plaintiffs in error, before the delivery of a decision, moved to have the case reargued before a full bench. This was denied. Subsequently, but still before the decision was rendered, counsel for plaintiffs in error again moved for a rehearing, on the ground that, after the death of one of the justices who heard the case, the other two had no power, under the law, to proceed to decide it. Chief Justice Bleckley being disqualified, it was suggested that a judge of the superior court should be appointed in the usual way; or, if this course were not proper, that, as the legislature would soon convene, the delivery of the decision should be withheld until a legislative expression might be had as to the appointment of a judge of the superior court in such a case, or that the case should be continued. The motion was denied and the decision delivered. (Rep.)

June 13, 1887.

Parent and Child. Wills. Constitutional Law. Public Policy. Negroes. Charge of Court. Fraud. Bastards. Practice in Supreme Court. Before Judge LUMPKIN. Hancock Superior Court. April Term, 1886

DuBose and Worthen propounded for probate a paper purporting to be the will of David Dickson, deceased. Smith *et al.* filed a *caveat.* The ordinary admitted the

will to probate, and an appeal to the superior court was taken. On the trial, a verdict in favor of the propounders was found. The caveators moved for a new trial on the following grounds :

(1), (2) Because the court erred in having this case tried before a jury taken from the grand jury under the following circumstances : The court had announced, before the regular term, that this case would not be tried, but he would hold an adjourned term at which it would be the first case called. In consequence of this announcement, the only counsel interested in the case who were present at the regular term were Messrs. Harley & Hunt, and they represented only a portion of the caveators, and reside in Sparta. At said term, J. T. Jordan, one of the counsel for the executors nominated in the will, approached the judge outside of the court-room, and made the request that this case should be tried before a jury taken from the grand jurors. The judge replied that he could not entertain a proposition of that kind outside of the court. Just before the adjournment of the fall term, and while the grand jury was in court, DuBose, one of the executors, arose in open court and requested that the grand jury be required to attend the adjourned term, in order that the propounders of the will might select a jury from them to try the case ; and after highly complimenting the traverse jurors of the county, he stated that he felt deeply the responsibility that was upon him as executor, and that as the law made a distinction between grand and traverse jurors, he desired the aid of the intelligence of the county, as represented by the grand jury, in discharging this trust and responsibility. The court said he would not decide any question in the case until it was called for trial, but would direct the grand jury to return on the 3d Monday in November, and did so. Before adjourning the regular term, the court asked the petit jurors whether they were willing to return on the 3d Monday in November, and there

being objections on the part of some of them, the court discharged them for the term. On the meeting of the adjourned term, counsel for the caveators urged their ob: jection against the selection of a jury from the grand jury list. The court sustained the objection against the selection of a jury from the panel of grand jurors then in court, but overruled the objection to the selection of a jury from the grand jury list, and held that, in his discretion under the statute, this case should be tried before a jury taken from the grand jury. The court stated that he had no authority to draw another grand jury at that adjourned term, and that he was inclined to think the effect of the ruling would continue the case. Counsel for both sides then consented that he draw at once thirty-six grand jurors, but counsel for the caveators insisted that the jury should be selected from the panel of traverse jurors who were present and competent.

(3) The court erred in allowing C. W. DuBose, execu- tor and propounder, to testify to any facts occurring be- tween himself and testator, because the witness was a legatee in the will. [The witness testified that he drew the will, taking a memorandum from the dictation of the testator; that the testator read the will and knew its con- tents; and that he was a man of strong mind and not easily influenced.]

(4) The court erred in allowing DuBose to testify to the facts stated in the preceding ground, and to other ma- terial things not in rebuttal of the testimony of the ca- veators.—The objection was that the witness wrote the will and was a legatee thereunder.

(5) The court erred in allowing DuBose to testify as to the blank space in the will, because it was not in rebut- tal, and varied and explained the writing by oral evidence. [DuBose testified, in rebuttal, as to a blank space of three lines in the will at the conclusion of the bequest to Amanda and her children, that it occurred in this way: When he took the memorandum, he and the testator were

talking the matter over, and the testator was asked if he wished to add anything in the event of the death of these parties without representatives, and he said he would think about it, and witness said he would leave a few lines blank. When his attention was called to the blank before the execution, testator said he did not wish to add anything and the blank was left.]

(6) The court erred in allowing Frank Riley and T. J. Worthen to testify to David Dickson's saying that he was Amanda's father.

(7) The court erred in allowing Thomas J. Worthen, the other named executor, and a legatee, propounding the paper, to testify as to conversations between himself and testator, over the objection of counsel for caveators, especially testator's claim to be Amanda's father.

(8) The court erred in not allowing caveators to prove by J. M. Dickson the following facts: That while Green Dickson, the brother of David Dickson, lived in the same house with David and their mother, Green threatened to kill David because he (David) had put Julia Dickson above their own mother, and had treated Julia with more respect and consideration than he did their own mother; and that this threat was made about the time Amanda was born. Caveators offered this testimony for two purposes: to show the influence of Julia over David Dickson as compared with the influence of his own mother; also as corroborating other testimony introduced by the caveators to show that Green Dickson was the father of Amanda.

(9) The court erred in charging the jury the whole of section 2399 of the code, especially the words, "He may bequeath the entire estate to strangers, to the exclusion of his wife and children, but in such case the will should be closely scrutinized, and, upon the slightest evidence of aberration of intellect, or collusion, or fraud, or any undue influence or unfair dealing, probate should be refused"; because the evidence showed that no wife or child of testator was in existence when the will was made or took

effect, and therefore this charge was inapplicable, and it was calculated to mislead and confuse the jury. While one of the caveators' counsel was addressing the jury, he referred to the law contained in this section as illustrating upon what ground wills should be set aside, and remarked to the court, "Your Honor is familiar with the section." The court understood this as an invocation of the section, but counsel did not so intend it, nor ask the court to give it in charge.

(10) The court erred in charging the jury as follows: "The propounders allege, and the burden of proof is upon them to show, that the paper which they have pre_ sented for probate, and which is before you, is the valid, legal, last will of David Dickson; and in order to do this, they are required to show, by a preponderance of testimony, that it was signed and witnessed according to law; that David Dickson had sufficient mental capacity to make a will; that he knew the contents of this paper; that the same expressed his wishes as to the disposition of his property after his death; and that he executed it of his own free will and accord. It is your duty to examine and carefully consider all the testimony, and to ascertain whether or not this paper contained all these necessary requisites. If you find that it does, it is a valid will; if you find that it does not, it is not a valid will."

(11) The court erred in charging the jury as follows: "One ground contained in the *caveats* filed alleges that David Dickson was not of sound and disposing mind and memory, and was incapable of making a will. On the subject of the amount of mental capacity necessary to make a will, I will read you the following sections of the code: (Here the court read sections 2405, 2407, 2408 and 2409.) This ground in the *caveats* not being insisted upon, I will not further instruct you as to the amount of mental capacity required to make a valid will."—Counsel for caveators had, in argument, notified the court and jury that the testamentary capacity of David Dickson was

conceded, and counsel for propounders had commented on that concession. To charge how little capacity it took to make a will, under these circumstances, was error, be- cause irrelevant and calculated to mislead the jury.

(12) The court erred in charging the jury as follows: "If it has been shown to your satisfaction by the testi- mony that the paper propounded was signed and exe- cuted in the manner prescribed by law, and if you are satisfied by the testimony that, at the time of its execu- tion, David Dickson was of sound mind, the burden of proof is on the caveators to make good these assertions of undue influence and fraud and to establish the truth of the same by a preponderance of testimony."—This charge shifted the burden upon the caveators to get rid of the paper upon the ground of undue influence, even though the jury might believe from the evidence that the will was never read by or to the testator, and that he did not know its contents. It was therefore error.

(13) The court erred in charging the jury as follows: "Before the jury can find that David Dickson was influ- enced to make his will, it must be affirmatively shown that his will was so subdued that the will of another was substituted for his, and that the influence was operative at the time of executing the will, and that the will was the offspring of that influence; the burden of proof is on the caveators to show that to a moral and reasonable cer- tainty, which is all that the law requires."—The error consists in the use of the word "will" in a double sense, and thus confusing the idea, and in requiring "moral and reasonable certainty," an undefined and misleading state- ment of the *quantum* of mental conviction, instead of a preponderance of evidence, upon which the jury might find. This charge was calculated to confuse the mind of the jury, under the peculiar facts of this case.

(14) The court erred in charging as follows: "Fraud is never presumed; it is proven, either by facts or by cir- cumstances. Before the will can be set aside for misrep-

resentations, it must appear that the misrepresentations were made, proven to be false, made in bad faith for the purpose of procuring the will."—It was error to so speak of setting aside the will, or of a subsisting will, when the question was whether the paper propounded was a legal will. It was error to say such representations, if false, must be made in bad faith if made to procure the will, and in saying that, if false and in bad faith, they must have been for the purpose of procuring that will; if in bad faith and false, they did procure the will; the purpose of the misrepresentations was immaterial; and it ignored the ground of mistake of fact in this caveat, or applied to which it was error.

(15) The court erred in charging as follows: "If the will was executed according to form of law, if that is proven, it is incumbent upon the objectors to prove to the satisfaction of the jury that it was the result of fraud or undue influence operating at the time of making."—This was error, because this burden was not cast by the mere proof of execution "according to the forms of law."

(16) The court erred in charging the jury as follows: "If fraud or undue influence is proven at a time remote from the time of the execution of the will, the law will not presume its continuance at the time of execution. It must be shown by the contestants that they existed at the time of making; whether or not they continued, if ever existing, is a question of fact for the jury."—This was error, first, because it confused; second, because, starting with fraud and undue influence, it concluded by requiring their joint operation; and third, because there was a presumption of continuance growing out of the proof, if any, of fraud or undue influence once existing. The court should have charged nothing as to the presumption, or modified it substantially thus: "That a state of things once existing is presumed to continue until a change or some adequate cause of change appears, or until a presumption of change arises out of the nature of the subject." This was not a

case of legal presumption, but a question of fact from which the jury might have drawn any inference which all the circumstances might suggest.

(17) The court erred in charging as follows: "If the jury believe that Dickson made a will several years before making the last one, containing substantially the same provisions as this, and that first will was his free and voluntary act, free from fraud or undue influence, it must be shown by the contestants that they existed at the time of making the last."—This charge is obscure; it made the court intimate the value or fix the weight of that fact of prior execution, etc., and excluded other grounds of objection to this last will.

(18), (22), (24), (25), (28). [These grounds are set out in the first division of the decision.]

(19) The court, after charging, at the request of the caveators' counsel, " that if any witness in this case has been impeached in either of the ways above stated, *i. e.* by disproving the facts testified to by the witness or by proof of contradictory statements previously made by the witness as to matters relevant to the witness's testimony and to the case, or by evidence of the witness's general bad character, the jury are authorized to disbelieve the testimony of such witness or any part thereof," added these words: "And may consider whether or not such witness has been corroborated."—The request was right and the addition was unnecessary, confusing and an incorrect statement of the law as to corroboration.

(20) The court, after charging as requested by counsel for caveators as follows : " The jury are authorized to disbelieve the evidence of a female witness if the witness discloses in her testimony acts done by her and habits of life pursued by her which exhibit moral turpitude in herself; the court intimates nothing as to whether there is any female witness in this case, or if so, that she has or has not so testified ; these are questions for the jury," erred in adding these words : " If any female witness has testified

to such acts or habits of herself, you may consider, if the testimony authorizes it, what her present character and habits are, in passing upon her credibility"; because the request was right by itself, and the addition, if in itself right, was inapplicable, because no evidence of present character or habits of such a witness appears in this case.

(21) The court refused to charge as follows: "If evidence of any material fact be within the peculiar control of a party to a cause and be withheld from the jury, the law raises a presumption that such evidence would be injurious to that party. The court intimates no opinion as to whether any such evidence exists or has been withheld by either party in the case. If the jury believe that the facts proven in this case show that such evidence does exist, and has been withheld, the jury should inquire whether the evidence introduced in the case satisfactorily explains why such other evidence, if any, was withheld, but the jury cannot go outside of the evidence in the case, and reasonable inferences therefrom, to account for the withholding of such evidence." As appears by the brief of evidence, propounders made profert of Amanda's children in open court before the jury, and then and there examined witnesses as to their likeness to their reputed father and testator, and they could and should have produced Amanda to have her features so scanned in deciding the paternity of herself.

(23) The court erred in refusing to charge the following: "The influence of a lawful relation over testamentary disposition is not prohibited by law, except when unduly exercised over the very act of devising, but that of unlawful relation is naturally and ordinarily unlawful, in so far as it respects testamentary dispositions favorable to the unlawful relation and unfavorable to the lawful heirs."

(26) The court erred in charging the jury as follows: "In determining whether or not undue influence was used, the jury may consider what relation existed between the alleged testator and any of the persons named as legatees,

and if it appears that he sustained towards any of such persons or towards another, or others connected with them by blood, unlawful or immoral relations, the same may be considered by the jury in reaching a conclusion on the question of undue influence; and if any such relations ever existed, the jury may consider whether or not they had ceased. The existence of such unlawful or immoral relations alone would not be sufficient to authorize you to set aside the paper propounded."—This was error, first, because there was no pretence of any such relations to any legatee under said paper; and so much of that charge as related to legatees was irrelevant and confusing; second, because it treated the paper as a thing to be set aside, when it has never been set up in law; and third, because the last sentence was giving an opinion as to the weight of evidence, when that was wholly for the jury.

(27) [Substantially set out above.]

(29) Because of newly discovered evidence. [This was to the effect that the witness saw Green Dickson hugging and kissing Julia, trying to induce her to have sexual intercourse with him; that Green was intoxicated, and she refused, giving as a reason that folks there were looking at him. Another stated certain facts tending to show that once testator and Julia had a fight and subsequently a reconciliation, and that her conduct toward testator was overbearing rather than submissive. A third stated that, during the life-time of testator's wife, he often went to testator's house on business and found his wife alone; that he inquired as to testator, and his wife said "he had gone up to his heaven," pointing to where Julia lived on the hill.]

(30) Because two of the jurors who tried the case were disqualified by reason of interest, and this disqualification was unknown to caveators until during the trial of the case and pending the introduction of testimony in the same. [Each of these jurors made affidavit that they were indebted to the estate of the testator, individually or as executor; that such indebtedness in no way influenced

his conduct as a juror, but he looked solely to the evidence and the law given in charge; and that, had there been sufficient evidence to set aside the will, he would not have hesitated in so doing.   One of them stated that his interest was equal, whether the paper was set up or not.]

The motion was overruled, and the caveators excepted.

N. J. HAMMOND; HILL & HARRIS; BACON & RUTHERFORD; R. W. PATTERSON; R. D. SMITH; J. A. HARLEY; T. M. HUNT, for plaintiffs in error.

C. W. DuBOSE; W. M. & M. P. REESE; JOHN T. JORDAN; REESE & LITTLE, for defendants.

HALL, Justice.

In response to a notice served by the executors of David Dickson, late of Hancock county, deceased, on his heirs and distributees, to show cause why his will should not be proved in solemn form, a portion of them appeared and caveated the probate, on the grounds:

(1) That the will was procured by the undue influence of Amanda Dickson and her mother, Julia Dickson, or one of them.

(2) That it was procured by the fraud of said Julia and Amanda in inducing said David Dickson to believe that said Amanda was his child, when she was not; and that her sons were the sons of Eubanks, when they were not.

(3) That the whole paper is a scheme to carry into effect the last clauses of item 4, all of the 7th item, and all of the 9th item, relating to said Amanda and her said children, the alleged natural sons of Eubanks, which items are inconsistent with the laws or contrary to the policy of the State; and therefore the whole paper is void as a will for this and for the reasons stated in the *caveat* and this amendment; that if the whole is not void, said parts are void for said reason.

The other reasons stated in the original *caveat* of file were, that the paper was not David Dickson's will; that he had not testamentary capacity to make a will; that it was made under the undue influence and improper control exercised over him by Amanda Dickson; that it was made under a mistake as to his heirs of law, and was not such a will as he would have made had he known the facts, because the paper was, in its scheme and nature and tendency, illegal and immoral and contrary to the policy of the State and of the law, and destructive and subversive of the interests and welfare of society.

The will was admitted to probate by the court of ordinary; and from this judgment the caveators appealed. On the appeal trial, all question as to the capacity of the testator to make a will was abandoned. The other grounds of the *caveat* were those relied on to defeat the probate of the will. On this trial, as well as that before the ordinary, the will was sustained, and a judgment was taken admitting it to probate and record.

The material questions discussed before this court were :

(1) That the will was the result of the undue influence exercised by Amanda Dickson, one of the principal beneficiaries under its provisions, and her mother, Julia Dickson, upon the testator.

(2) That it resulted from false and fraudulent representations made by Amanda and Julia, not only as to the paternity of Amanda, but of Amanda's children, it being insisted that Amanda was not the child of the testator, and that her sons, Julian H. and Charles G., were not the natural sons of the testator's deceased friend, Charles H. Eubanks.

(3) That, in consequence of these facts, the will embodied a scheme of Amanda and Julia to carry out the same by virtue of the items and provisions in favor of Amanda and her children; that the scheme was inconsistent with law and contrary to the public policy of the State; and if it did not render the whole paper void as a

will, it did so at least as to the items or portions in favor of Amanda and her children, because of its tendency to promote illegal and immoral intercourse between Amanda and her alleged paramour, the said Eubanks, such intercourse being destructive and subversive of the welfare and interests of society.

The items of the will bearing upon these questions are the following:

"Item 4th. I give, bequeath and devise to Julian H. Dickson and Charles G. Dickson, minor children of Amanda A. Dickson, and the natural sons of my deceased friend, Charles H. Eubanks, and to the survivor of them, in case either should die leaving no child or children or representatives or representors of a deceased child or children, the two tracts of land in Hancock county (describing), adjoining the land of Baxter, the Alexander place, now occupied by said children and others, containing in all five hundred acres, more or less. I appoint Amanda A. Dickson, mother of said children, the testamentary guardian of the property given to her children by this item of my will, and my executors are directed to turn over said property to her as such guardian, to be managed by her for them till they or either of them marry or come of age, at which time, as the case may be, said property may be divided, share and share alike. If both of said children should die before marriage or attaining lawful age, leaving no child or children or the representative of a deceased child surviving, then the property in this item shall go to Amanda A. Dickson, their mother."

"Item 7th. I give, bequeath and devise all the rest and residue of my estate, not expressly disposed of by this will otherwise, as well all I now own as all I may hereafter accumulate up to the time of my decease, including lands, live-stock, farming implements, crops on hand and crops growing, railroad stock, bonds, notes, accounts and everything else of value I may own at my death, to Amanda A. Dickson, of Hancock county, now living with her mother near my plantation, for and during her natural life, free, clear and exempt from the marital rights, power, control or custody of any husband she may have, with full power to her, the said Amanda A. Dickson, without the aid or interposition of any court, to sell said property and convey the same, and to reinvest the proceeds of said sales in other property or in good security to be held for her for her life as aforesaid. I charge the property bequeathed by this item of my will with the support and education of the children of the said Amanda A. Dickson, as well those here · after to be born as those now living; their support to be ample, but not extravagant, their education to be the best that can be

procured for them with a proper regard for economy,—all of which I leave to the sound judgment and discretion of the said Amanda A. Dickson, without any interference from any quarter. As either of the children of the said Amanda A. Dickson, born or to be born to her, come of age or marry, I direct her to set off to such child so marrying or coming of age a portion of said property, she to determine in her unlimited discretion what property and how much shall be set off, with only this instruction, that the amount must not be so great as to defeat or imperil my purpose to provide for her during life, and for her children, as well those to be born hereafter as those now in life. Upon the death of the said Amanda A. Dickson, I give, bequeath and devise what may remain of the property embraced in this item of my will to the children of the said Amanda A. Dickson, and the representatives of any deceased child, share and share alike, such representatives taking *per stirpes*, and not *per capita.*"

The ninth item named the propounders as his executors, directed them to prove his will in solemn form and to turn over to said Amanda all the property given her for life, and requested them to see to it while they live, "that Amanda A. Dickson and her children are protected in their person and their property under the laws, so far as they may be able to do so," and gave each of the executors $2,500 in lieu of commissions.

1. We shall consider, first, whether this will, in the various items mentioned above, and according to its scheme and the proof had upon that subject, can be deemed contrary to public policy and void, and whether that question was clearly and properly submitted to the jury under the charge of the court and the testimony in the case. To do so intelligently, it will be necessary to state accurately the several charges of the court upon that subject to which the caveators excepted; and these will be found in the 18th, 22d, 24th, 25th and 28th grounds of the motion for new trial, which are as follows:

(18) "The court erred in charging the jury, at request of counsel for the propounders, as follows: 'There is no public policy in Georgia which prevents colored persons from taking property under a will,' without more, and without coupling to that the consideration of illicit intercourse which may have produced said will."

(22) "At request of counsel for caveators, the court charged the jury that, 'If Amanda was the bastard child of David Dickson, begotten in this State of a negro slave prior to the late emancipation, he was under no obligation to support or provide for such child prior to such emancipation, except as a slave, if his slave, but then only while she was his slave'; and was requested further in writing to charge, 'No obligation was upon David Dickson, if he so begot said slave, to support and provide for her after emancipation; or if any such obligation existed, it ceased upon her becoming 21 years old'; and the court so charged, leaving out the words, 'or if any such obligation existed, it ceased upon,' and inserting 'and' after emancipation, and then refused to charge, as requested in writing, 'If this will was made after such majority and Amanda was such a bastard of this testator, the parts giving this property to her are void, because contrary to public policy.' The refusal of this request was error."

(24) "The court erred in refusing to charge, as requested in writing by the counsel for caveators, 'If the jury believe from the evidence that this will sought to be propounded is contrary to the policy of the State of Georgia, then the jury would be authorized to find against the will.'"

(25) "The court erred in refusing to charge as follows: 'Under the constitution and laws of the State of Georgia, marriages between white persons and negroes are forbidden, and the public policy of the State is against the mingling of the blood of these races, and if you believe this will is against said policy, it is absolutely void'; though requested in writing by counsel for the caveators."

(28) "The court erred in concluding his charge as follows: 'Every man in this State has a right to will his property to whom he pleases. There is no policy of the State which would make it unlawful or contrary to such policy for a man to will his property to a colored person, to any bastard or to his own bastard, and such considera-

tions as these would not alone authorize a ·will to be set aside; but you may consider all the facts, relationships and circumstances in evidence in deciding the questions made before you, which I have already stated and explained to you.' It was error in the conclusion thus to group and state the facts touching the case; thus to use the words 'set aside' in the statement of the absence of a policy as to a testator's bastard without regard to whether he owed any legal obligations to such bastard, and because it did not sufficiently emphasize that matter of illegal cohabitation."

It will be remarked that this will makes no provision for Julia, who, it is alleged, was the concubine of the testator; that there was no pretence of marriage between Eubanks and Amanda; and that there is no direct evidence going to establish the fact that the intercourse between Amanda and Eubanks took place and was carried on in consequence of any previous agreement or promise, on the testator's part, to make provision for Amanda and the children born in consequence of that intercourse. The will was made after that intercourse had ceased, and after the death of Eubanks. It was not seriously insisted that past cohabitation would render a gift by the party holding such a relation to a woman void or illegal; and had it been so contended, the argument could have rested upon no legal principle whatever. Indeed, from a very early period, the law has been well settled to the contrary. *Vide Beall vs. Beall*, 8 *Ga.* 224; *Hargroves vs. Freeman*, 12 *Id.* 342; *Davis vs. Moody*, 15 *Id.* 175.

A contract to make compensation for the injury done in consequence of past illegal cohabitation, which contained no stipulation for future intercourse, has been held to be valid; and even where such a contract had been fully executed, and the intercourse was kept up afterwards, yet if it did not appear that the subsequent cohabitation was made a stipulation in the contract, it has been maintained; where there was no evidence of any promise or under-

standing, other than that inferred from the fact of future illicit intercourse between the parties, this did not affect the validity of the transaction. Thus, where a bond had been given in consideration of past cohabitation, without any express stipulation to that effect, or without evidence from which it could be shown that the future cohabitation of the parties was one of its conditions, although in fact they subsequently so cohabited, it was held that the bond was nevertheless valid, and upon it an action could be maintained. Chitty on Contracts, 979; Trovinger *vs.* McBurney, 5 Cowen Rep. 253; Gray *vs.* Mathias, 5 Ves. 286; Hall *vs.* Palmer, 3 Hare, 532; Brown *vs.* Kinsey, 81 N. C. 245; Greenhood on Pub. Policy, 204, 207, both inclusive, and other citations in the notes thereto; Gay *vs.* Parpart, 106 U. S. 679.

" The test," says Dillard, J., in delivering the opinion in Brown *vs.* Kinsey, "always is, does it appear by the contract itself, or was there any understanding of the parties, though not expressed, that the intercourse was to continue ?"

Neither at the testator's death, nor when the will was executed, could a continuance of the relations between Eubanks and Amanda have been contemplated, for, as before remarked, Eubanks was then dead. There is absolutely nothing in the case to show that the testator, as contended by the caveators, had knowledge of any illicit intercourse between Worthen, one of his executors, and Amanda, subsequent to Eubanks' death. The circumstances in proof warrant no such inference; and nothing beyond vague suspicion or mere conjecture could impute to him knowledge of the fact or a purpose on his part to make provision with a view to the creation of such a relation between these last named parties. One thing is certain: that there was no offspring from this intercourse during the life of the testator; nor is there a single fact in proof to charge him with knowledge of it, or to show that he in any way encouraged or promoted it. His will

certainly made no provision for the carrying on of such intercourse, or for the maintenance and support of any offspring that might result therefrom. The principal complaint here is, that anything which has a tendency to induce intercourse between persons of the white and negro races, is contrary to public policy, and consequently void; and this conclusion is drawn from the prohibition of marriage between these races, as found in our constitution and laws. Illicit intercourse between persons of the same as well as different races is made penal by our code; as also intercourse between persons standing in near relations of consanguinity or affinity to each other, whether that intercourse take place in consequence of prohibited marriage or otherwise. It is well settled that a white man may be guilty of fornication or adultery with a colored woman, and *vice versa;* and that a white or colored man, if a child is begotten in consequence of such illicit intercourse, may be held liable for bastardy. *Allen vs. Harris,* 40 *Ga.* 220. Indeed, there is no difference in this respect between the rights and liabilities of the different races.

The 14th amendment of the constitution of the United States provides in express terms, that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court of the United States has decided that this amendment made all colored persons born in the United States, and subject to its jurisdiction, citizens of the United States and of the States in which they reside. 16 Wall. 90, 95, 97, 620; 20 Wall. 615; 92 U. S. *Munroe et al. vs. Phillips, adm'x.,* 64 *Ga.* 32.

v 78 28

Under the constitution of Georgia, section 5017 of the code, "All citizens of the United States, resident in this State, are hereby declared citizens of this State;" and it is made the duty of the General Assembly to enact such laws as will protect them in the full enjoyment of the rights, privileges and immunities due to such citizenship. And to this effect is section 44 of the code. All distinctions as to the rights pertaining to citizenship between the two races are abolished by this legislation and by these constitutional provisions. As to their civil rights, they stand upon the same footing. It follows, therefore, that whatever rights and privileges belong to a white concubine, or to a bastard white woman and her children, under the laws of Georgia, belong also to a colored woman and her children, and that the rights of each race are controlled and governed by the same enactments or principles of law.

Among the rights of citizens of this State enumerated in section 1654 of the code, are the right to the acquisition and enjoyment of private property and the disposition thereof, the right to vote, hold office, etc. It is unquestionably true that a testator, by his will, may make any disposition of his property, not inconsistent with the laws or contrary to the policy of the State. Code, §2399. And this accords with the general law upon this subject. Most persons in modern times, by that law, are deemed capable of taking under wills, and the exceptions as to those who are incapable of taking are carefully enumerated, and rest generally upon grounds of public policy. Upon these grounds alien enemies are excluded from benefits under wills, and so are others whose participation in such benefits could, in any sense of the word, be called immoral; if a will makes a devise or bequest to further or carry into effect some illegal purpose which the law regards as subversive of sound policy and good morals, such devise or bequest will be held void, and the executor would not be justified in paying it. The conditions of a testamentary

gift tending to separation or divorce between husband and wife would be treated as void ; and to the same general principle of good morals and sound policy may be referred various miscellaneous restraints upon testamentary disposition which local law sees fit to enforce. Thus, under the Louisiana code, a will made in favor of the testator's concubine is treated as null and void. Gibson *vs.* Dooly, 32 La. An. Rep. 959. Doubtless the local conception of public policy on such points is liable, in different jurisdictions and at different times and different epochs, to great variations. Decisions must greatly vary in consequence. Schouler on Wills, §§22, 23.

There is nothing in the law of Georgia, that we have seen, inhibiting compensation for past illegal cohabitation being made by a white man to a white woman; and under the law as it now stands, there can be nothing to prevent its being made by such white man to his colored paramour. No arrangement for future cohabitation with a black or white woman would be valid in favor of the woman or any party deriving a benefit from it. There is nothing in our law prohibiting a putative father from making provision for his illegitimate child, or for the illegitimate offspring of such child. And even conviction of treason or felony, or any lower grade of crime, works no corruption of blood or forfeiture of estate. Bill of Rights, sec. 2, par. 3, code, §5020. So that a felon or his offspring may take testamentary benefits under the law of this country. No one would contend for a single moment that a contract, agreement or understanding, founded upon a consideration, in whole or in part, for the commencement or continuance of meretricious intercourse between the sexes, would not be directly contrary to law or public policy and the best interests of society.

What is public policy? And where must we look to find it? And in ascertaining and applying it to the transactions of life, by what rules and precautions are the courts to be guided? On this latter topic, it is manifest from

many decisions that judicial tribunals hold themselves bound to the observance of rules of extreme caution when invoked to declare a transaction void on grounds of public policy; and prejudice to the public interest must clearly appear before a court would be warranted in pronouncing the transaction void on this account.

In Richmond *vs.* Dubuque and Sioux City Railroad Co., 26 Iowa, 190, 202, it is said that "the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

After laying down, in terms somewhat different, the same general rule, it was said by Howe, J., of the Supreme Court of Wisconsin, in pronouncing the judgment of the court in Kellogg *vs.* Larkin, 56 Am. Decis. 164, 168: " He is the safest magistrate who is more watchful over the rights of the individual than over the convenience of the public, as that is the best government which guards more vigilantly the freedom of the subject than the rights of the State."

So in Swann *vs.* Swann, recently determined in the United States Circuit Court for the Eastern District of Arkansas, 21 Federal Rep. 699, it was said by Caldwell, J., delivering the opinion: " No court ought to refuse its aid to enforce a contract on doubtful or uncertain grounds. The burden is on the defendant to show that its enforcement would be in violation of the settled public policy of the State, or injurious to the morals of its people. Vague surmises and flippant assertions as to what is the public policy of the State, or what would be shocking to the moral sense of its people, are not to be indulged in."

In the leading case of Richardson *vs.* Mellish, 2 Bing. 229 (9 Eng. C. L. Rep. 557), the observance of the rule as thus limited is strongly upheld and rigidly enforced by the whole court. Each of the judges presiding in that case delivered separate opinions, though they all concurred in the result.

Best, C. J., says : "We have heard much of this being a contravention of public policy, and that on that ground it cannot be supported. I am not much disposed to yield to arguments of public policy ; I think the courts of Westminster Hall (speaking with deference, as an humble individual like myself ought to speak, of the judgments of those who have gone before me) have gone much farther than they were warranted in going in questions of policy ; they have taken on themselves, sometimes, to decide doubtful questions of policy, and they are always in danger of so doing, because courts of law look only at the particular case, and have not the means of bringing before them all those considerations which ought to enter into the judgment of those who decide on questions of policy. I therefore say it is not a doubtful matter of policy that will decide this, or that will prevent the party from recovering ; if once you bring it to that, the plaintiff is entitled to recover; and let that doubtful question of policy be settled by that high tribunal, namely, the legislature, which has the means of bringing before it all the considerations that bear on the question, and can settle it on its true and broad principles. I admit that if it can be clearly put upon the contravention of publi? policy, the plaintiff cannot succeed; but it must be unquestionable—there must be no doubt; looking at all the facts of this case, I can see no unquestioned principle of policy that stands in the way of the plaintiff to prevent him recovering in this action." Criticising and explaining two cases (Card *vs.* Hope, 2 B. & C. 661, and Blanchard *vs.* Preston, 8 T. R. 81), which were relied on as opposed to this rule, the learned Chief Justice admits that in one of the cases there are expressions used by Chief Justice Abbott which seem to bear upon the present case. "But," he says, "the expressions of every judge must be taken with reference to the case on which he decides, otherwise the law will get into extreme confusion. That is what we are to look at in all cases. The manner in which he is

arguing is not the thing; it *is* the principle he is deciding. If ever I could have imagined it could have been extended to such a case as this, I would have protested against, though I could not have prevented, the decision. I would in my place have protested against it, for I should have seen the injustice and confusion to which such a doctrine would have been liable to be extended. I am quite satisfied that not one of the learned judges who decided that case ever conceived that its authority could be pressed to the extent to which it has been pressed in this case."

His colleague, Park, J., refers to those cases for the principles they determine, and not for their facts. He concurs, as far as necessary, in the respective judgments rendered in them, and says: "The judgment given by my Lord Chief Justice Abbott was very elaborate; but though I concur with the judgment in that case, I am by no means prepared to agree with every *dictum* in that judgment. I am quite satisfied that the reference to general policy in that case by my Lord Chief Justice Abbott was going further than was absolutely necessary, and I think there is nothing here to show illegality."

Sir James Burrough, the other judge, said: "The next point is that it is illegal. I am of opinion that on the face of this count there is no illegality. If it be illegal, it must be illegal either on the ground that it is against public policy, or against some particular law. I, for one, protest, as my lord has done, against arguing too strongly upon public policy; it is a very unruly horse, and when once you get astride it, you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail." Further on in his opinion, he says: "As to the point of public policy, a great deal has been said, many cases have been mentioned, and in Blatchford *vs.* Preston, a great number of general phrases were made use of by the learned judge. But you ought not to govern courts of justice by general expressions used

in the administration of the law. They may have some weight, but they ought not to govern; you must look to what the point of decision was."

In Walsh *vs.* Fussell, 6 Bingham, 169 (19 Eng. Com. Law Rep. 83), Lord Chief Justice Tindal, in pronouncing judgment, said: "It is not contended that the covenant was illegal on the. ground of the breach of any direct rule of law, or the direct violation of any statute; and we think to hold it to be void on the ground of its impolicy or inconvenience, we ought to be clearly satisfied that the performance of it would be necessarily attended with injury or inconvenience to the public."

In order to ascertain whether the provisions of Girard's will,—because they excluded ecclesiastics, missionaries and ministers of any sect from holding or exercising any station or duty in the college thereby founded, and limited the instructions to be given to the student to pure morality and general benevolence and the love of truth, sobriety and industry, thus excluding by implication all instruction in the Christian religion—were in contravention of the public policy of the State, the Supreme Court of the United States held that they were not at liberty to travel out of the record to ascertain what were the private religious opinions of the testator, nor to consider whether the scheme of education by him prescribed was such as they themselves should approve, or as was best adapted to accomplish the great aims and ends of education; nor could they look to the general consideration of the supposed interest and policy of the State of Pennsylvania on the subject, beyond what its constitution and laws and judicial decisions made known to them. Consequently they held that the question as to what is the public policy of the State, and what is contrary to it, if inquired into beyond these limits, would be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of the judicial duty and functions, and upon which men may and will "com-

plexionally differ." They therefore disclaimed any right to enter upon such examinations beyond what the State constitution, laws and decisions necessarily brought before them. Vidal *et al. vs.* Girard's executors, 2 How. 127, 197 *et seq.*

Such was the view taken by Starnes, J., and Benning, J., in *Adams, guardian, vs. Bass, ex'r,* 18 *Ga.* 144 *et seq.,* and 154 *et seq.,* as to what constitutes public policy, and the sources from which the rules on that subject are to be derived.

We cannot think that the judge erred in refusing to charge the jury that, if they believed from the evidence that the will sought to be propounded was contrary to the policy of the State of Georgia, then they would be authorized to find against it. As to what constitutes public policy, and as to what contravenes it, is not a question of fact for the jury, but is a question of law to be determined by the court. Any other rule than this would lead to confusion and injustice, and instead of settling, would go far to unsettle, the law upon this subject.

In Pierce *et al. vs.* Randolph *et al.,* 12 Texas Rep. 290, Chief Justice Hemphill, as the organ of the court, says: " But it seems that a new rule has been discovered by which to test the validity of contracts, and that is, the belief of the jury with regard to their tendency to immorality and breaches of the peace; and this even where such contracts have been declared by the courts of last resort to be valid in law, and to have all the force and efficacy which the law can impart to any contract. No doctrine more subversive of law and of private and public rights could have been devised. In fact, it sets them afloat upon public sentiment, to fluctuate and rise and fall with the ebb and flow of popular opinion, and when brought to trial, to succeed or fail, not according to the established rules of law, but upon the belief, the private opinions, or, in other words, the whims and caprices, of the juries before whom they were presented. The most sacred rights, those most

cherished by the law, might be frustrated and defeated without any regard to law; a justice of the peace with his jury might deem them against morals, good order or public policy." And after giving some striking instances of the dangerous tendency of such a practice, he continues: "It is the duty of both judges and juries to decide on rights according to the laws of the land, and not on their belief as to what ought to be law. Their office is not legislative; it is judicial; it is to administer the law as they find it, and not to exalt their own belief or notions above the law, and follow them as a higher code by which the rights of the community are to be regulated and controlled."

Tried by these rules, we cannot say that Dickson's will is unquestionably and beyond a doubt against public policy. We know of no constitutional provision or statute or any decision of our courts, nor are we aware of any principle of the common law, which holds it to be immoral or wrong for the putative father to make provision for his illegitimate child, whether that child be white or colored; or for the illegitimate offspring of such child, whatever the complexion of such offspring may be; or for any one who has lived in violation of the public law and thereby become a criminal, either to a greater or less extent, unless that provision is the result of a previous understanding that led to the commission of the offence and induced a breach of the law and sound public policy of the State.

We have seen that such an understanding is not to be lightly inferred from facts and circumstances of doubtful import and meaning, or which may admit of different constructions, one consistent with and the other opposed to unquestioned policy. The legislature has not seen fit to declare that the tendency of such provisions would be promotive of immorality, and would induce the formation and continuance of such illicit cohabitation, and for that reason, to prohibit them, as has been done by the provision cited from the code of Louisiana. Whether such inhibi-

tion would be good or bad policy, is not for us to determine. The question is one upon which there has existed, and still exists, a contrariety of opinion, as will be seen by what was said by Lumpkin, J., in the case of *Beall vs. Beall*, cited above. And this being the case, its solution is entirely beyond the scope and functions of the judicial department of the government. If judges would avoid uncertainty and fluctuations in the administration of the law, and render it uniform and consistent, they should follow the admirable advice given by Lord Chancellor Bacon to a magistrate whom he was about to swear into office, "Look to your books for the law, and not to your brain." Above all, they should not give themselves up to the guidance and direction of their feelings and sentiments, for this would unquestionably lead to excessive irregularity, fluctuations and doubt. They would then realize that the fame which follows is better than that which goes before, and would avoid the supreme folly of mistaking the plaudits and shouts of the multitude of their cotemporaries for the trumpet of fame. Loyalty to the law and rigid adherence to the rules it prescribes, is to the enlightened magistrate the plain path of duty, and in pursuing it he can fall into no error nor run into any kind of danger.

2. The next material question for consideration is based upon the ground that the will was procured by the fraud of Julia and Amanda in inducing David Dickson to believe that Amanda was his child, when she was not, and that her sons were the sons of Eubanks, when they were not. Among other instructions to the jury, the following appear in the general charge of the court : "If the testator was not deceived or misled in any way by the statements or conduct of another or others, then the paper should not be set aside for fraud."

Again, "It is alleged that Amanda and Julia Dickson, or one of them, exercised undue influence over David Dickson's mind, and that they deceived and misled him

by making false and fraudulent representations to him concerning the paternity of Amanda and of her children, and thereby procured and induced him to make and execute this paper as his will.   It is incumbent on the caveators to make these allegations appear by testimony, before you would be authorized to say that they are true. If the allegations as to the conduct of Amanda and Julia, which I have mentioned to you, have been established to your satisfaction by credible testimony, either circumstantial or direct, you should act upon the same under the rules given you in charge."

At the request of the caveators, this charge was given: "If the will, or parts of the same, be the result of fraudulent practices upon either the fears or affections or sympathies of testator, then it, or the parts so produced, should be pronounced void.   You are the sole judges of whether any such fraudulent practices have been shown by the evidence, or are fairly inferable therefrom.   The court intimates no opinion on that subject."

" A will procured by misrepresentations or fraud of any kind to the injury of the heirs at law, is void.

" If the jury believe from the evidence that the legacy to Amanda Dickson and her children in this will constitutes part of one testamentary scheme, and that all the other legacies were intended to be parts of that one testamentary scheme, and if the jury further believe that the said legacy was procured by fraud, misrepresentation, or undue influence exercised by Julia or Amanda, or both, then the jury would be authorized to find against the validity of the whole will.

" If the jury believe from the evidence that David Dickson made this will under the impression that Amanda was his natural child, and if they believe that the will, or so much thereof as relates to Amanda and her children, was induced solely by that belief; if they further believe from the evidence that Amanda was not his child ; then they would be authorized to set aside and declare void so much

of said will as relates to said Amanda and her children."

The court also charged, at the request of the propound-
ers, " Fraud is never presumed; it must be proved, either
by facts or circumstances. Before the will can be set
aside for misrepresentations, it must appear that the mis-
representations were made, proved to be false, made in
had faith for the purpose of procuring the will."

To the latter portion of this charge various errors are
assigned and are set forth in the 14th ground of the mo-
tion for new trial as follows :

(1) It was error to so speak of setting aside the will, or
of a subsisting will, when the question was whether the
paper propounded was a legal will; (2) it was error to
say such representations, if false, must be made in bad
faith if made to procure the will, and in saying that if
false and in bad faith, they must have been for the purpose
of procuring that will; (3) if in bad faith and false, they
did procure the will; the purpose of the misrepresenta-
tions was immaterial; and it ignored the ground of mis-
take of fact in this *caveat*, as applied to which it was error.

Our analysis of this charge is, that the paper propounded
as a will cannot be set aside for alleged misrepresentations,
unless it appear from the evidence that such representa-
tions were proved to be false; that they were made in bad
faith and for the purpose of procuring the paper pro-
pounded as a will. Standing alone, the latter clause in this
charge would, we think, be error, and subject to the crit-
icism made upon it. The issue actually presented was,
that the representations were false, with whatever view
or purpose they may have been made; and if they had
the effect of procuring the will, whether they were made
with that object or not, it would be quite immaterial, if
they were false and they had the effect of procuring the
paper propounded as a will; whether made for that pur-
pose or not, the will should have been set aside; but taken
in connection with other parts of the charge, especially
those portions hereinbefore set out, we are unable to con-

clude that the charge contravened or modified this view, or that the language of the court. admits of such restricted signification as has been attributed to it. We think it altogether probable that the jury could not have been misled or confused by the use of the terms employed, and induced to believe that the said representations must have been made with the design to procure the will. Indeed, they were expressly charged, at the request of caveators' counsel, "if they believed from the evidence that David Dickson made this will under the impression that Amanda was his natural child, and if that will, or so much thereof as relates to Amanda and her children, was induced solely by that belief, and they further believe from the evidence that Amanda was not his child, then they would be authorized to set aside and declare void so much of said will as relates to Amanda and her children." This and other charges given would seem to render the exception to the portion of the charge in question nugatory and groundless. Besides, there is no allegation in this motion for new trial that the finding of the jury upon this point was contrary to evidence. All objections to the verdict on this ground seem to have been waived; and had they not been so waived, we are satisfied, from the overwhelming preponderance of the testimony, that Amanda was the natural child of David Dickson, and he could not have acted under any mistake as to that fact in the execution of his will; there is hardly a suspicion raised in the proof that Amanda's children were not the sons of Eubanks. So this ground of the motion does not appear, as whole or as to its separate parts, to rest upon any solid foundation. It is barely possible, though not at all probable, that Amanda may have been the child of another than David Dickson. There is scarcely a possibility that her children could have had any father other than Eubanks.

3. The remaining ground of the motion for new trial to be considered is as to the influence exerted over David

Dickson by Amanda or her mother, and which induced him to make this will. Apart from the representations as to the paternity of Amanda and that of her children, we are unable to ascertain that any effort was made by either of these parties or others to exert any influence over the testator, nor is it made clear that he was subject to such influence, or that his will was so weak and his purpose so infirm as to justify the belief that either could have been controlled or overcome in that manner.

4. As to the remaining grounds of the motion for new trial, we feel satisfied that they are destitute of any such merit as would authorize us in interposing to set aside this will. Indeed, we cannot say that there was error either in selecting the jury from the panel of the grand jury or in drawing and summoning that panel, or in the reception or rejection of testimony, etc., or in the assignments of error to the various charges as given or refused of which complaint was made, or in the rules laid down for judging of the credibility of certain witnesses who testified in the case, or lastly, in refusing to hold Turner and Middlebrooks, two of the jurors who tried the case, to be biased or prejudiced. They do not appear to have been operated on by outside and improper influences, and for that reason to have been incompetent and disqualified to sit as jurymen.

From aught that appears to the contrary, the trial was fair, and under our view of the law, would not probably result differently upon another hearing. We repeat that we are satisfied that if any error existed at all in the various rulings and charges of the court, it was immateral.

Judgment affirmed.